Lon R. Leavitt
Utah State Bar No. 11245
**HALUNEN LAW**
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: 602-254-6494
Fax: 612-605-4099
Email: leavitt@halunenlaw.com
*Attorneys for Relator Greg Dahlstrom*

FILED
2022 JUN 17 PM 12:30
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* GREG DAHLSTROM, <br><br> Plaintiffs, <br><br> vs. <br><br> ECHELON FITNESS MULTIMEDIA, LLC, ECHELON FITNESS, LLC, and VIATEK CONSUMER PRODUCTS GROUP, INC., <br><br> Defendants. | Case No.: <br><br> **COMPLAINT AND JURY DEMAND** <br><br> **ORIGINAL COMPLAINT FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** <br><br> **DO NOT PLACE IN PRESS BOX** <br> **DO NOT ENTER ON PACER** <br><br> Case: 2:22–cv–00411 <br> Assigned To : Parrish, Jill N. <br> ~~Assign. Date : 6/17/2022~~ <br> Description: Sealed v Sealed |

1. Through two different, but related, schemes that began many years ago, Defendants, Echelon Fitness Multimedia, LLC, Echelon Fitness, LLC (collectively referred to as "Echelon") and Viatek Consumer Products Group, Inc., fraudulently reduced their duty liability owed to the United States by falsely undervaluing imported goods. Defendants accomplished their fraud by failing to include/account for the true cost of the goods and by keeping two sets of invoices and giving the United States only the false and fraudulent ones.

1

2. In these ways, Defendants submitted false and/or fraudulent claims to the United States and knowingly made, used, or cause to be used, a false record or statement to knowingly decrease their duty obligations owing to the United States in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732 ("FCA").

3. Defendant Echelon imports and sells internet-enabled, connected fitness equipment that allows for interactive, on-demand exercise classes and workouts. Echelon's fitness equipment includes a touch screen tablet through which fitness instruction and classes are displayed and offered to the participant. Echelon and Viatek import a number of different pieces of connected exercise equipment, including bikes, smart treadmills, rowing machines, and fitness mirrors.

4. When importing its exercise equipment into the United States, Defendants fraudulently and falsely underdeclared the "Entered Value" of the exercise equipment. By lowering the exercise equipment's valuation, Defendants reduced their duty liability that was owing to the United States.

5. Defendants implemented a two-part fraud scheme over the last several years. First, Echelon and Viatek[1] participated in a duplicate commercial invoice scheme. The first invoice accurately represented the amount that Echelon or Viatek paid for the production of its exercise equipment and Echelon paid this amount to the manufacturer. The second invoice was nearly identical to the first invoice, but the amount of the invoice was approximately 25-30% lower than the first invoice. When entering goods into the United States, Echelon used the amount reflected on the second (false) invoice for valuation purposes when declaring the Entered Value to the

---

[1] Throughout this Complaint, both Echelon and Viatek participated in the schemes. Depending on the shipment, Echelon or Viatek was represented to be the importer of record. As such, Echelon and Viatek are used interchangeably throughout this Complaint, but both committed the same wrongful acts.

2

Customs and Border Patrol ("CBP"). Echelon attached the second, fraudulent invoice to its CBP Entry Summaries (Form 7501). When it imported these products, Echelon certified and represented that the valuations were true and correct when it knew they were not. By misrepresenting the Entered Value, Echelon fraudulently reduced its duty liability owing to the United States.

6. In the second scheme, Echelon failed to include/account for the cost of the tablets/LCD screens (hereinafter, these are referred to interchangeably as tablets or screens) used in its exercise equipment. Echelon purchased the tablets separately from the purchase of the exercise equipment. Echelon paid for the tablets directly. After purchasing the tablets, Echelon directed the tablet supplier to ship the tablets to the company that assembled the exercise equipment (the finished goods assembler). The finished goods assembler then assembled the exercise equipment and incorporated the tablets into the exercise equipment. Echelon paid the finish goods assembler for the cost of the exercise equipment, and this amount excluded the cost of the tablets. The tablet was properly considered an "assist," and the value of assists must be included in the declared value to CBP. Upon entry into the United States, Echelon declared the Entered Value to be the cost charged by the finished goods assembler, which amount did not include the cost of the tablets. Thus, the cost of the tablets was not declared to the CBP.

## I. JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

8. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants

3

have minimum contacts with the United States. Specifically, Defendants market and sell, and have sold, their exercise equipment within the District of Utah.

9. Venue is proper in the District of Utah pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because Defendants can be found in, transact business in, or have transacted business in this district. At all times relevant to this Complaint, Defendants regularly conduct, and continue to conduct, substantial business within this district by selling their products within this District.

10. Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

11. There are no bars to recovery under 31 U.S.C. §3730(e). Specifically, substantially the same allegations as those alleged in this suit have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agents were a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media. In the alternative, Relator is an original source as defined in 31 U.S.C. § 3730(e). Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and prior to filing this Complaint, Relator has voluntarily provided and disclosed all substantive information to the United States. Further, this action is not based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing at the State or federal level; in a congressional, legislative, administrative, General Accounting Office, or State Auditor's report, hearing, audit, or investigation; or from the news media.

4

## II.   PARTIES

12.   Plaintiff is the United States of America. The CBP is an agency within the Department of Homeland Security, which is responsible for collecting duties and other Customs fees owing to the United States.

13.   Relator Greg Dahlstrom, MBA, is a resident of Tennessee and is Echelon's Vice President of Supply Chain. Relator joined Echelon in February 2021, and he oversees supply chain planning, procurement, warehousing, and distribution. Relator reports to his superior, CFO Sam Touchstone. Zorilee Gascot is the Senior Vice President of International Finance and Operations. Ms. Gascot previously was responsible for many of Relator's duties. Ms. Gascot now is responsible for Echelon's international supply chain and operations outside of North America.

14.   Defendant Echelon Fitness Multimedia, LLC is a Delaware limited liability company with its principal place of business located at 605 Chestnut Street, Suite 700, Chattanooga, TN 37450. It previously was located at 6011 Century Oaks Drive, Chattanooga, TN 37416.

15.   Defendant Echelon Fitness, LLC is a Delaware limited liability company with its principal place of business located at 605 Chestnut Street, Suite 700, Chattanooga, TN 37450. It previously was located at 6011 Century Oaks Drive, Chattanooga, TN 37416.

16.   Defendant Viatek Consumer Products Group, Inc. ("Viatek") is a corporation organized and existing under the laws of the State of Florida. Viatek's principal place of business is 2081 SE Ocean Blvd, Suite 3B, Stuart, FL 34996. Viatek founded Echelon in 2017. Viatek is believed to be owned by Echelon CEO Lou Lentine. Viatek was previously located at 6011 Century Oaks Drive, Chattanooga, TN 37416.

17. Echelon is currently privately held. Its investors include North Castle Partners, Goldman Sachs, and others. Upon information and belief, Viatek is still a part owner of Echelon as well.

18. Echelon's exercise equipment connects its customers to Echelon exercise classes via the Echelon Fit application. This provides access to live and on-demand workout classes filmed at Echelon studios around the world and led by professional instructors. Echelon represents that its distribution footprint includes more than 25 retail partners worldwide with exclusive products designed for Amazon, Walmart, Target, Best Buy, Costco, and Sam's Club.

### III. APPLICABLE LAW

#### A. The False Claims Act

19. This is an action to recover damages and civil penalties on behalf of the United States arising from the false and/or fraudulent claims, statements, and acts of Defendants made and caused to be made in violation of the FCA.

20. The FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States. 31 U.S.C. § 3729(a)(1)(G). A claim brought under this section is commonly referred to as a "reverse false claim" such that the fraudulent actor avoided paying money it owed to the United States. In a more traditional false claim case, the fraudulent actor has received money it was not entitled to receive.

21. Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance

6

a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

22. The FCA defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

23. A false or fraudulent claim under the FCA may take many forms, "the most common of which is a claim for payment for goods and services not provided or provided in violation of contract terms, specification, statute or regulation." S. Rep. No. 99-345, at 9 (1986).

24. The FCA defines the term "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

25. The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

### B. Relevant Customs Law

26. All merchandise imported into the United States is required to be "entered," unless specifically excepted. 19 C.F.R. § 141.4(a); 19 U.S.C. § 1484. "Entry" means, among other things, that an importer or its agent must file appropriate documents with an officer of CBP that allows CBP to assess the customs duties due on the merchandise. 19 U.S.C. § 1484(a)(1)(B); 19 C.F.R. § 141.0a(a).

27. Importers are required to file an Entry Summary (CBP Form 7501). Among other things, the entry summary contains the date of import, the importer of record, a code signifying the entry type (including whether the entry contains any items subject to anti-dumping duties), and the value of the items.

28. The Entry Summary also must contain the appropriate eight-digit subheading from the Harmonized Tariff Schedule of the United States ("HTSUS") that best describes each item of merchandise. 19 C.F.R. § 142.6. The HTSUS became effective in January 1989.

29. HTSUS classifies all articles imported into the United States and subjects each article to a duty of some sort. The particular tariff classification of merchandise within the HTSUS determines the duty amount that importing entities must pay to the government.

30. The amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate.

31. Importers are required to maintain, and submit upon request, documentation supporting the statements made on the Entry Summary. Such documentation includes a Commercial Invoice, a Packing List, a Country of Origin Certificate, and a Bill of Lading. See, e.g., 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a); 19 C.F.R. § 163.4.

32. The value or approximate value (the "Entered Value") of the imported merchandise must be declared on the Entry Summary in Box No. 32 and such valuation is also supported by the attached commercial invoice(s).

33. Federal law provides that every importer must file a declaration stating that the values set forth on these documents are accurate. 19 U.S.C. § 1485.

Case 1:22-cv-00222-KAC-CHS    Document 1    Filed 06/17/22    Page 8 of 20    PageID #: 222

34. The Entry Summary form includes a declaration that:

> I further declare that the merchandise [ ] was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, OR [ ] was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of knowledge and belief. I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.
>
> I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

CBP Form 7501.

35. Imported goods are usually valued on the basis of their "transaction value." 19 U.S.C. 1401a(a)(1)(A); 19 C.F.R. § 152.101(b)(1).

36. The transaction value is the "price actually paid or payable" plus amounts equal to the value of any "assists." 19 U.S.C. § 1401a(b).

37. Pursuant to 19 U.S.C. § 1401a(h), the term "assist" means:

> any of the following if supplied directly or indirectly and free of charge or at a reduced cost by the buyer of imported merchandise for use in connection with the production or sale for export of the merchandise:
>
> (i) Materials, components, parts, and similar items incorporated in the imported merchandise.
> (ii) Tools, dies, molds, and similar items used in the production of the imported merchandise.
> (iii) Merchandise consumed in the production of the imported merchandise.
> (iv) Engineering, development, artwork, design work, and plans and sketches that are undertaken elsewhere than in the United States; and are necessary for the production of the imported merchandise.

38. The term "price actually paid or payable" means the total payment (whether direct or indirect) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller. 19 U.S.C. § 1401a(b)(4)(A); 19 C.F.R. § 152.102(f).

9

39. All customs invoices for the entry of products to the United States must include a description of "[a]ll goods or services furnished for the production of the merchandise not included in the invoice price." 19 C.F.R. § 141.86 (a)(11).

40. Many commercial goods imported into the United States are also subject to harbor maintenance fees and merchandise processing fees. The Harbor Maintenance Fee is intended to require those who benefit from maintenance of U.S. ports and harbors to share the cost of the maintenance. The fee is assessed as 0.125% of the value of the commercial cargo. 19 C.F.R. § 24.24; 19 C.F.R. § 152.103. The fee is listed on the Entry Summary.

41. Formal and informal entries are subject to a Merchandise Processing Fee at the time of entry. 19 C.F.R. § 24.23(b)(1). The fee is set at 0.3464% of the value of the merchandise being imported, as determined under 19 U.S.C. § 1401a and 19 C.F.R. § 152.103. The maximum fee charged per entry is $485 and the minimum is $25. 19 C.F.R. § 24.23(b)(1)(i)(B). The fee is listed on the Entry Summary.

## IV. FACTUAL ALLEGATIONS

42. Echelon previously worked with customs broker Steam Logistics, LLC to import its products and to file customs documents on its behalf.

43. Echelon's current customs broker is Radix Group International, Inc. d/b/a DHL Global Forwarding.

44. Throughout the last several years, Echelon Fitness Multimedia, LLC and/or Viatek are represented to be the importers of record on the Entry Summaries associated with the importation of Echelon's exercise equipment. However, regardless of whether the importer of record was Echelon or Viatek, the products were sold under the Echelon brand.

45. From approximately 2017 through the present, Echelon repeatedly underdeclared the Entered Value of its exercise equipment that it imported into the United States.

46. Echelon has filed hundreds, if not thousands, of false Entry Summaries with the United States. Each Entry Summary includes a certification that the declared valuations (the Entered Values) are correct and that the invoices are also accurate. Yet, when Echelon entered its exercise products, it knowingly misrepresented the actual value of the exercise equipment and used false invoices to conceal its fraud.

47. Echelon and Viatek participated in at least two different fraud schemes, each of which allowed it to fraudulent reduce the duty it owed to the United States. In the allegations below, both Echelon and Viatek were involved depending on which entity was represented to be the importer of record.

### 1. Echelon and Viatek Failed to Include the Value of Tablets in Declared Entered Values to CBP

48. The first scheme involves Echelon (and Viatek when it was the importer of record) knowingly omitting the cost/value of "assists" when it declared the Entered Value of exercise equipment it imported into the United States.

49. The tablets are considered "assists" and must be included in the declared transactional value on the CBP Entry Summaries.

50. By failing to include and declare the value of these assists to the CBP, Echelon falsely declared that the exercise equipment's Entered Value was lower than its actual value.

51. Even if the tablets/screens are not considered to be "assists," the tablets' cost to Echelon still must have been declared and included in Echelon's declared Entered Values to the CBP since the tablets were used in the exercise equipment and are an integral component of the internet-connected exercise equipment.

52.     Echelon did not include the purchase price of the tablets in its declared Entered Values.

53.     Echelon personnel told Relator that Echelon purchased tablets for use in its exercise equipment separately than the purchase of the exercise equipment.

54.     Echelon directed the tablet supplier (commonly, the main tablet supplier was Shenzhen Kinstone D&T Develop Co., Ltd.) to ship the tablets to the finished goods assembler so that the tablets could be incorporated into the exercise equipment. The tablet supplier provided purchase orders to Echelon for the full amount owing via email.

55.     Upon receipt of the tablet purchase order, Echelon paid the tablet supplier via wire transfer, and the tablets were then shipped to the finished goods assembler.

56.     The cost of each tablet varied depending on the type of tablet and what piece of exercise equipment was being assembled. Relator believes the tablets cost approximately $160-$315 each depending on the type of tablet.

57.     Xiamen is one of Echelon's main finished goods manufacturers (the actual assembler of the exercise equipment).

58.     After the tablets were purchased and shipped to Xiamen for incorporation into the exercise equipment, the cost of the tablets was never declared to the United States.

59.     Upon entry into the United States, Echelon declared the Entered Value of the exercise equipment to be the amount charged by the finished goods assembler. This amount did not include or account for the cost of the tablets. Echelon therefore underdeclared the Entered Value of the equipment.

60.     Upon entry into the United States, Echelon classified its exercise equipment under an HTS Code that was subject to a tariff rate of 4.6%. This tariff rate is multiplied by the declared

12

Entered Value to calculate the duty Echelon owed to the United States. Echelon's scheme deprived the government of applicable duty and fees on the amounts that were not declared to the United States.

61.     Additionally, the applicable HTS Code for Echelon's exercise equipment was further subject to an additional 7.5% ad valorem tax during much of 2020 and 2021 pursuant to Section 301 Tariffs. As such, Echelon fraudulently avoided this additional 7.5% ad valorem tax on the underdeclared entered value.[2]

### 2. Echelon and Viatek Participated in a Duplicate Invoice Scheme Whereby False Invoices were Presented to CBP

62.     In addition to failing to include the value of the tablets in the declared Entered Value, Echelon and Viatek participated in a fraudulent duplicate invoice scheme from 2017 through approximately May 2021.

63.     Echelon contracted with a finished goods assembler to build the exercise equipment, and that manufacturer issued an invoice to Echelon for the completed exercise equipment. The manufacturer, commonly Xiamen, prepared two separate invoices.

64.     The first invoice was the amount that the assembler actually charged Echelon for the exercise equipment. Echelon actually paid the invoice amount on the first, correct invoice.

65.     The second commercial invoice was fraudulent, and Echelon knowingly used the fraudulent invoice to support its declared Entered Values to the CBP.

66.     The second invoice was the same as the first invoice except that the amount of the invoice was approximately 25-30% less than the first invoice. Despite paying the correct amount

---

[2] Echelon classified its exercise equipment as HTS 9506.91.0030, which classification was included on Section 301 Tariff list 4A.

13

represented on the first invoice, Echelon attached the second, false commercial invoices to the CBP Entry Summaries. Furthermore, Echelon used the amount of the second invoice as the Entered Value on the Entry Summaries.

67.     This scheme is difficult to detect since on their face, the amounts declared on the Entry Summary and commercial invoices match one another. But, the invoices were fraudulent.

68.     Through this duplicate invoice scheme, Echelon underdeclared the Entered Values by 25-30%.

69.     While the fraud schemes described herein are separate, the two fraud schemes are related because in many shipments, Echelon actually implemented both fraud schemes: 1) it failed to include the cost of the tablets in the declared Entered Values; and 2) it used a false commercial invoice that reduced the actual production cost.

70.     The CEO, Lou Lentine, has knowledge of these schemes.

## V. REPRESENTATIVE EXAMPLES OF FRAUD

71.     Each of the following examples demonstrates the undervaluation scheme by using a fraudulent invoice. Additionally, in both examples, the value/cost of the tablet is not included.

72.     Such Entry Summaries include false statements and records that were knowingly provided to the United States. When Echelon and Viatek filed their Entry Summaries, they declared that

> the merchandise [ ] was obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true, **OR [ ]** was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of knowledge and belief. I also declare that the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and that all goods

14

or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed.[3]

73. Such declarations were knowingly false and allowed Echelon to reduce the amount of duty it owed to the United States.

**Example 1: CBP Entry No. STL-0023075-4[4]**

74. CBP Entry No. STL-0023075-4 has a summary date of April 14, 2021, and a date of entry of April 4, 2021. The country of origin and exporting country was China.

75. Echelon declared to CBP it was importing 359 rowing machines, and Echelon declared the Entered Value of the rowing machines to be $72,769.

76. Echelon classified the exercise equipment under HTS Code 9506.91.0020, which was subject to a tariff rate of 4.6%. Thus, Echelon certified the duty it owed (excluding harbor and maintenance fees) was $3,347.37. At the time of the Entry, this HTS code was also subject to Section 301 Tariff at the ad valorem rate of 7.5%, which Echelon represented to be $5,457.68.

77. The rowing machines were manufactured by Xiamen Zhoulong Sporting Goods Co., Ltd. ("Xiamen"). Attached to the Entry Summary was Xiamen's commercial invoice (Invoice # 2008A25606) that represented the cost of the rowing machines to be $72,769. However, this invoice was fraudulent since it misrepresented the cost it charged to Echelon for the rowing machines.

78. Echelon actually purchased the rowing machines from Xiamen for $97,317.72.

---

[3] Entry Summary, CBP Form 7501.

[4] While these examples pertain to Echelon, Viatek also participated in both schemes when it was the importer of record. But, in all scenarios, the products were sold under the Echelon brand.

15

79.     The true and accurate commercial invoice indicated that the unit cost for each of the 359 rowing machines was $271.08, for a total invoice amount of $97,317.72, which was the amount Echelon paid to Xiamen for the 359 rowing machines.

80.     Pursuant to *only* the fraudulent invoice scheme, Echelon undervalued this shipment by $24,548.72. This undervalued amount was not declared and was subject to normal duty rate of 4.6% and an additional ad valorem Section 301 Tariff rate of 7.5%. These duties were not paid despite being owed to the United States.

81.     Furthermore, the declared value of the rowing machines did not include the cost of the tablet, which Echelon purchased separately and then provided to Xiamen for use in the rowing machines.

82.     Each of the 359 rowing machines included a tablet, and each tablet cost Echelon $248. The correct commercial invoice even included a notation that "The unit price [271.08] is not included [sic] Tablet." Thus, not only did Echelon undervalue the goods through the duplicate invoice scheme, but it also failed to include the value of the tablets, which must be accounted for.

83.     Echelon's declared Entered Value was further undervalued by an additional $89,032, which is the cost of the tablets ($248 x 359 rowing machines) Echelon assisted to Xiamen.

**Example 2: CBP Entry No. STL-0021545-8**

84.     CBP Entry No. STL-0021545-8 has a summary date of January 27, 2021, and a date of entry of January 14, 2021. The country of origin and exporting country was China.

85.     Echelon declared to CBP it was importing 1,000 exercise bikes, and Echelon declared the Entered Value of the bikes to be $161,200. These exercise bikes are connected bicycles that allow for interactive workouts.

16

86. Echelon classified the exercise equipment under HTS Code 9506.91.0030, which was subject to a tariff rate of 4.6%. Thus, Echelon certified the duty it owed (excluding harbor and maintenance fees) was $7,415.20. At the time of the Entry, this HTS code was also subject to Section 301 Tariff at the ad valorem rate of 7.5%, which Echelon represented to be $12,090.00.

87. The exercise bikes were manufactured by the same manufacturer as in the first example, Xiamen. Attached to the Entry Summary was Xiamen's commercial invoice (Invoice # 2008A24053) that represented the cost of the exercise bikes was $161,200. However, this invoice was fraudulent since it misrepresented the cost it charged to Echelon for the exercise bikes.

88. Echelon actually purchased the 1,000 bikes from Xiamen for $217,800.00.

89. The true and accurate commercial invoice indicated that the unit cost for each of the 1,000 exercise bikes was $217.80, for a total invoice amount of $217,800.00.

90. Pursuant to *only* the fraudulent invoice scheme, Echelon undervalued this shipment by $56,600.00. This undervalued amount was not declared and was subject to normal duty rate of 4.6% and an additional ad valorem Section 301 Tariff rate of 7.5%. These duties were not paid despite being owed to the United States.

91. Furthermore, the declared value of the exercise bikes did not include the cost of the tablet, which Echelon purchased separately and then provided to Xiamen for use in the exercise bike. Each exercise bike included a tablet, and each tablet cost $160. Thus, not only did Echelon undervalue the goods through the duplicate invoice scheme, but it also failed to include the value of the tablet. The tablets were assists, which must be declared to the CBP.

92. The Entered Value was further undervalued by an additional $160,000 ($160 x 1,000 bikes), which was the cost of the tablets Echelon assisted to Xiamen to be used in the exercise bikes.

17

## Count 1

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(G)

93. Relator repeats and re-alleges the allegations contained in Paragraphs 1 through 92.

94. In violation of 31 U.S.C. § 3729(a)(1)(G), the Defendants knowingly made, used, or caused to be made or used, a false record and/or statements material to obligations to pay customs duties to the United States, and/or knowingly concealed or knowingly and improperly avoided or decreased obligations to pay customs duties to the United States.

95. The United States incurred losses in the form of customs duties underpaid by Defendants because of their wrongful and fraudulent conduct. Specifically, the Defendants' knowingly underdeclared the Entered Value of the goods it entered into the United States, and such underdeclared Entered Values lowered the duty owing to the United States.

96. By virtue of the false records or statements made by Defendants, or by virtue of Defendants' knowing concealment or knowing and improper efforts to avoid or decrease their customs obligations, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial and a civil penalty as required by law for each violation.

## Count 2

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(C)

97. Relator repeats and re-alleges the allegations contained in Paragraphs 1 through 92.

98. In violation of 31 U.S.C. § 3729(a)(1)(C), defendants conspired to commit a violation of subparagraph (G) of 31 U.S.C. § 3729(a)(1).

18

99. Defendants conspired to knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government.

100. As a result of this conspiracy, the United States was damaged in an amount to be determined at trial.

**WHEREFORE**, Relator, on behalf of the United States, respectfully requests that judgment be entered in its favor and against Defendants as follows:

1. On the First and Second Claims for Relief, treble the United States' damages in an amount to be determined at trial, such civil penalties as are required by law, and an award of costs pursuant to 31 U.S.C. § 3729(a);

2. On the First and Second Claims for Relief, that the Court award the Relator all amounts as are permitted under 31 U.S.C. § 3730(d), including an appropriate share of any sums recovered and benefits obtained by the United States in this action under any Claim for Relief, now or in the future, along with the Relator's reasonable expenses, attorneys' fees, and costs incurred herein; and

3. Such further relief as is proper.

**UNDER <u>FEDERAL RULE OF CIVIL PROCEDURE 38</u>, RELATOR DEMANDS A**

**TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted,

**HALUNEN LAW**

s/ Lon R. Leavitt

Dated: June 17, 2022      BY: _____

Lon R. Leavitt
Utah State Bar No. 11245
One Renaissance Tower
Two North Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: 602-254-6494
Fax: 612-605-4099
Email: leavitt@halunenlaw.com

KATERS & GRANITZ, LLC
Tim Granitz (WI: 1088934)
(*Pro Hac Vice* Motion Forthcoming)
8112 West Bluemound Road, Suite 101
Milwaukee, WI 53213
Telephone: 262-617-3545
Email: tgranitz@katersgranitz.com

*Attorneys for Relator Greg Dahlstrom*

20